CRAIN, Judge.
This is an appeal from a decision by the State Civil Service Commission upholding appellant’s termination from the position of *1190 Deputy Executive Officer for Management of the Housing Authority of New Orleans.
FACTS
Appellant, Lawrence J. Nicholas, has been employed in various administrative positions within the Housing Authority of New Orleans (HANO) since May 16, 1956. Nicholas served as assistant project manager, manager, and administrative officer (now reclassified as area director). After placing first in a statewide competitive examination for the position of Deputy Executive Officer for Management, he was promoted to that position in December, 1980. Throughout his 26 years of employment as an administrator at HANO, Nicholas has never received an unsatisfactory civil service rating. As a matter of fact, as late as May 10, 1982, Sidney Cates, Executive Director of HANO, and appellant’s immediate superior, gave Nicholas a satisfactory civil service rating. On July 28, 1982, Nicholas was terminated from his position by Cates. In a fifteen page notice of termination it was alleged that Nicholas was guilty, among other things, of numerous acts of incompetence, making poor management decisions, working contrary to management, not accomplishing tasks, not meeting deadlines and being unusually cheerful during a tenants’ demonstration against HANO. Several of the allegations of misconduct took place as far back as 1981.
Nicholas filed a notice of appeal on August 10, 1982. A public hearing was held before a referee appointed by the commission.
In its conclusions of law the commission held that the appointing authority had not met its burden in establishing cause for disciplinary action in the following instances:
Appellant’s recommendation about employing a full-time welder at the B.W. Cooper Apartments; appellant’s cursing his piers [sic] when they were critical of an accounting procedure; influencing a subordinate supervisor not to do work; deliberately sabotaging work being done on the modernization program; telling Mr. Charles Stevens that his Civil Rights have been violated in connection with a disciplinary action; seeking the support of Development Managers in opposition to the Executive Director; not getting the Cooper TMC Board to agree to Housing Authority’s plans for utilization of MOD funds; problems relating to excessive amounts of cash being kept on development cites; appellant’s being unsup-portive of the Executive Director during a protest demonstration; appellant’s being unusually happy during the demonstration; appellant’s having a dislike for the Executive Director; and, appellant’s carrying a gun to get rid of the Executive Director. Further, the Referee finds that charges in the letter of termination that appellant intentionally disrupted and undermined the morale of the employees of the Housing Authority of New Orleans to amount to nothing more than appellant’s having a difference of opinion with the Executive Director and as such, not cause for disciplinary action. Brickman v. New Orleans Aviation Board, 107 So.2d 422 (La.1958).
However, the commission found that the appointing authority had proved the remainder of the charges. Some of these charges, it was held, constituted only poor job performance and were just cause for disciplinary action. Additionally, the commission concluded that appellant’s failure to submit requested information and written reports constituted acts of insubordination, thereby justifying his termination.
From this decision Nicholas appeals, alleging eight assignments of error. The primary issues for review are whether there was just cause for appellant’s termination and whether termination was an excessive or unduly harsh penalty. Although we agree with the commission that some acts of appellant were proved which may be interpreted as poor job performance, we do not agree there was sufficient proof of insubordination to justify termination. We will consider the findings individually.
*1191 STALE CHARGES
In the fifth assignment of error appellant contends that evidence of appellant’s alleged acts of incompetence occurring prior to May 10, 1982, the date of appellant’s satisfactory civil service rating, should be excluded. It is argued that these actions were brought to the attention of Cates who either condoned the actions or reprimanded Nicholas as he then thought was necessary. These past acts should, therefore, not be used as a basis for Nicholas’ termination.
Past actions of an employee may be considered as cause for disciplinary action by a superior even though the superior’s predecessor either condoned the action or found that the conduct did not warrant disciplinary action. Ragusa v. Department of Public Safety Division of State Police, 238 So.2d 193 (La.App. 1st Cir.1970), writ refused, 256 La. 885, 239 So.2d 542 (1970).
“[S]taleness” alone is no reason for disregarding a charge, so long as it forms the real basis for the proposed disciplinary action

There is no hard and fast rule to be applied in cases of this type. We recognize that there must be a point at which an appointing authority must take action relative to an employee’s misconduct or else be precluded from so doing.
Ragusa, 238 So.2d at 195. Where an employee has been reprimanded or disciplined for particular action or inaction this court has refused to allow the appointing authority to resurrect this incident as grounds for further disciplinary action. Department of Public Safety, Office of State Police v. Rigby, 401 So.2d 1017 (La.App. 1st Cir. 1981), writ denied, 406 So.2d 626 (La.1981); Hamlett v. Division of Mental Health, Louisiana Health and Human Resources Administration, 325 So.2d 696 (La.App. 1st Cir.1976).
Several incidents specified in the notice of termination occurred in 1981:
1)Appellant allegedly submitted an inadequate report regarding excessive rental chargeoffs at the Desire Development. The report was requested on October 1, 1981, and Cates received the memoranda on October 13, 1981, and November 2, 1981.
2) In December, 1980, appellant allegedly prepared notices to HANO residents regarding an increase in ceiling rents. The notice allegedly did not conform to HUD procedure and was corrected and distributed in February, 1981.
3) On July 13, 1981, appellant allegedly incorrectly handled the disciplinary action against an employee.
4) By memoranda issued in September, 1981, Cates allegedly informed appellant that better communication and coordination should be established within appellant’s department. Appellant’s attempted compliance was allegedly inappropriate.
5) Appellant allegedly did not take appropriate steps to discipline an employee to the satisfaction of Cates in December, 1981.
6) Appellant allegedly did not reduce the number of vacancies in the developments as ordered to do so by Cates in November, 1981.
In each of the above described incidents Cates either reprimanded appellant by memorandum or condoned the incidents. In either case Cates apparently felt that further disciplinary action was not warranted because appellant has received satisfactory ratings from Cates, even as late as May 10, 1982. Accordingly, we hold that the appointing authority (Cates) is estopped from resurrecting the above listed 1981 incidents as a basis in this disciplinary proceeding.
LEGAL CAUSE FOR DISCIPLINARY ACTION
In the first, second, third, fourth, sixth and seventh assignments of error appellant raises the issue of whether the appointing authority met its burden of proving that there was legal cause for the disciplinary action which resulted in appellant’s termination.
*1192 “No person who has gained permanent status in the classified state or city service shall be subjected to disciplinary action except for cause expressed in writing”. La. Const, art. 10, § 8(A). Cause for a disciplinary action exists where the efficiency of the public service is impaired by the complained of conduct. In addition, a real and substantial relation must exist between the employee’s conduct and the efficient and orderly operation of the public service. Albert v. Louisiana State Penitentiary, 396 So.2d 340 (La.App. 1st Cir. 1981). “The final decision of the commission shall be subject to review on any question of law or fact upon appeal to the court of appeal.” La. Const, art. 10, § 12(A). The standard of review to be applied to the factual findings of the commission is the manifest error rule. Walters Department of Police of the City of New Orleans, 454 So.2d 106 (La.1984).
A) AMENDMENT TO DWELLING LEASE
The commission apparently found that the appointing authority proved that appellant made no decision or made illogical and ineffective decisions in several instances as charged in the notice of termination.
The commission found that:
11. In September of 1981, the Housing Authority sought to and amended its Dwelling Lease in regard to security deposits, utilities, and redetermination of rent. The action was being taken because of the Housing Authority’s poor financial posture and HUD’s requirement that the Housing Authority establish an acceptable financial work out plan. Appellant was in charge of implementing the procedure. Notice was given to the tenants and the changes were approved by HUD to be effective February 1, 1982. Appellant did not require the tenants to immediately sign the amendment, but issued instructions that the amendment should be signed at the time the tenant is reexamined which would require one year before all tenants had signed the amendment. This put the Housing Authority in a difficult position, as appellant had instructed his personnel to begin collecting the security deposits and the utility billings immediately.
The record reveals, however, and it is uncontradicted, that appellant consulted an attorney employed by HANO in reference to the proper procedure to be used in implementing the amendments. Nicholas acted in good faith on the advice of the Housing Authority attorney. A tenant filed suit in reference to this matter and at the time of the hearing the lawsuit was unresolved.
We find that Nicholas acted in a prudent manner by obtaining the legal advice of his in-house counsel. The fact that this decision later became the subject of a lawsuit does not negate his good faith reliance upon the recommended legal advice and does not amount to legal cause for disciplinary action. We hold that the commission’s legal conclusion in this regard is clearly wrong.
B) GUSTE HOMES-POWER OUTAGES
The commission found that:
13. Mr. Cates became aware of a problem concerning electrical outages at the Guste Development after a protest demonstration held on June 9, 1982. Mr. Cates instructed appellant to keep him posted on a daily basis about the status of electrical problems at the Guste Development. •' Appellant made no report to Mr. Cates indicating whether or not the problem had been solved. Mr. Cates had to make daily inquiries by telephone to appellant and his staff to be advised about the problem.
In the notice of termination it was alleged that Cates should have been apprised of the power outages by appellant. He should not have been surprised to learn of the outages at the demonstration of June 9, 1982, since the outages had been occurring since May 15, 1982.
The record reveals that the Hot Line emergency repair reports and accompanying memoranda were sent by Mr. Cu-sachs to appellant on a daily basis and were *1193 then forwarded to Cates. As established by the testimony of Ms. Norris, Manager of Guste Homes, steps were taken on May 20,1982, by Nicholas’ department to rectify the situation. Corrective measures were taken as soon as the outages began, including: inspecting the apartments for outlawed air-conditioners which were suspected to be the main cause of the outages; meetings between the Area Director, Nicholas and the residents on May 20,1982, and June 3, 1982; counseling of tenants and eviction proceedings. Some of these corrective steps were taken before Cates became personnally involved. After a meeting between Cates, Nicholas, an electrical contractor and a maintenance superinten-dant on June 9, 1985, Nicholas was instructed to keep Cates “apprised on a daily basis if we experienced another outage." Additional outages occurred on June 10, 11 and 14, 1982. On June 14, 1982, a memorandum was sent from Norris to Nicholas and a copy was sent to Cates giving a progress report on the issue. Nicholas admitted to not having personally kept Cates apprised of the continuing outages and the record does not reveal a justifiable excuse as to why he failed to comply with Cates’ instructions. We find Cates’ instructions to Nicholas were reasonable and easy to accomplish, however, for some undisclosed reason Nicholas did not comply. We find this to be just cause for disciplinary action.
C) REQUEST BY SOUTH CENTRAL BELL TO PERFORM WORK ON THE PREMISES
The commission found that:
14. In June of 1982, appellant forwarded to Mr. Cates a memorandum requesting approval of a request by South Central Bell to perform work on Housing Authority premises. The memorandum lacked necessary information. Mr. Cates informed appellant that he should be making the decision and he should do so -after obtaining the necessary information.
The record reveals that by this time the relations between Cates and Nicholas were strained. Nicholas’ memorandum stated that this was a routine management function yet he still requested Cates’ approval. Nicholas testified that at that point in time Cates was displeased with and returned almost everything which Nicholas submitted. He had already made the necessary inquiries as a routine managerial function and had requested Cates’ approval only in an abundance of caution. We find that the appointing authority has failed to establish legal cause for disciplinary action in this instance. We find the legal conclusions of the commission in this instance are clearly wrong.
D) MEMORANDUM REGARDING PROPOSED SUSPENSION
The commission found that:
16. On June 1, 1982, Mr. Cates received a memorandum from appellant about a proposed suspension of an employee. The proposed letter of suspension was initiated by one of appellant’s subordinates and was deficient in the description of the offense the employee allegedly committed. The letter was sent to Mr. Cates by appellant asking for his recommendation by the end of the day. Appellant should have had the deficiencies in the draft corrected and should have included his own recommendations before sending it on to Mr. Cates.
Nicholas testified that both he and Mr. Triggs, an Area Director of HAND, approved of the foreman’s recommended action before forwarding the proposed letter of suspension to Cates. Cates’ approval as appointing authority was required in order for personnel to process the disciplinary action. Had Nicholas or Triggs disapproved the proposed disciplinary action, it is quite logical that Nicholas would not have sought Cates’ approval of the action. However, no written record of their recommendations was included with the proposed suspension letter. A review of the record convinces us that the commission’s finding of legal cause for disciplinary action in this instance was clearly wrong.
*1194 E) WORKING CONTRARY TO MANAGEMENT/POLICY DECISIONS-MOD PROGRAM
The commission found that:
19. On January 8, 1982, at a meeting in Mr. Cate’s [sic] office, appellant committed his division, the Management Division, to a plan for the relocation of residents at the St. Bernard Development so that a contractor could begin the modernization of two buildings on February 3, 1982. On January 21, 1982, Mr. Cates determined that the plan was not being followed and an alternative plan was worked out while appellant was on authorized leave.
It was also found that:
21. On May 17, 1982, Mr. Cates conducted a preliminary inspection of the first modernized building at St. Bernard. The inspection was in anticipation of the official inspection and acceptance scheduled for May 27, 1982. Mr. Cates found that doors and screens for the apartments were missing; exterior wood work badly needed paint; and grass surrounding the building needed cutting. Mr. Cates instructed appellant to have the doors and screens fixed and painting done. Appellant explained the difficulty he would have in doing the work. Appellant did not influence a subordinate supervisor not to do the work as was charged in the letter of termination.
A review of the record reflects that Mr. Triggs, Area Director, Mr. Pittari, Director of Central Maintenance, and Nicholas testified that the transition building would have been completed on time barring unavoidable delays caused by the weather. The bad weather occasionally caused condensation on the interior walls which prevented interior painting. In the instances where painting was performed over the condensation the paint began to peel. The building was, however, completed on time.
When Cates conducted a preliminary inspection of the first modernized building at St. Bernard he was upset by the exterior condition of the building and ordered that the exterior work be completed. Mr. Heisser, Director of Technical Services, testified that the exterior work had been given a low priority status due to the limited budget of the modernization program. From the outset it had been planned that top priority would be given to the interior. Exterior work would be done on a “catch as catch can” basis. After Cates ordered a change in priorities the record reveals that Nicholas encouraged its completion, expressing concern to his employees, that if they felt that the exterior work could not be accomplished as scheduled then the employees should speak out to avoid embarrassment to HANO and the department. After reviewing the record we find that the commission was clearly wrong in determining that appellant’s actions in reference to the above described incidents constitute legal cause for disciplinary action.
F) SHRUB TRIMMING
The commission found that:
23. Mr. Cates instructed appellant in April of 1982 to have all developments begin grass cutting and shrub trimming. In June, 1982, upon visiting the Lafitte Development, Mr. Cates noted that the shrubs needed to be trimmed. By memorandum dated June 14, 1982, Mr. Cates asked appellant about his plans to address cutting shrubs. Appellant responded, but did not advise Mr. Cates of his plans for cutting the shrubs. Mr. Cates insisted that appellant review the matter. Appellant forwarded a recommendation by Mr. C.W. Washington that gasoline trimmers be purchased. The recommendation was forwarded to Mr. Cates without comment by appellant. Appellant orally advised Mr. Cates that the Housing Authority could not purchase the items because it was not budgeted. Nevertheless, Mr. Cates approved the request for the purchase of the trimmers, but the hedges were not trimmed.
The record reveals that Nicholas responded to Cates’ memorandum by informing him that Mr. Washington, BMSII employed at the Lafitte development, was *1195 struggling to do the job with equipment which was continually breaking down and which, coincidentally, had been ordered purchased by Cates. In addition, the development was short one laborer. Nicholas informed Cates that a gas powered shrub trimmer, which would be more suitable for the task, was not a budgeted item and thus could not be purchased under the annual contribution contract between HANO and HUD. There was testimony to the effect that grass and shrub cutting was a problem at that time throughout HANO developments due to the grass cutting system in operation at that time and due to the faulty equipment. At the time of the hearing a different system of lawn and hedge trimming was put into effect with somewhat better results. We find that the commission was clearly wrong in holding that Nicholas’ recommendation amounted to incompetence. Additionally, we find the problems with grass cutting and shrub trimming which were prevalent at that time were not primarily attributable to Nicholas. The factual findings of the commission in this instance were clearly wrong.
G) CONSENT DECREE
The commission found that:
28. As a result of a suit filed against the Housing Authority of New Orleans in Federal District Court, the Housing Authority entered into a consent degree whereby the Housing Authority committed itself to complete preventive maintenance repairs on forty apartments per month.
29. In August of 1981, the Housing Authority was behind in meeting its established goal for repairs. Mr. Cates instructed appellant to report on the cause for not meeting the goal. Appellant reported to Mr. Cates that the Housing Authority would be back on schedule by October. However, at the end of October, the Housing Authority was fifty-seven apartments behind schedule and by the end of December, one hundred ten units behind.
30.On March 24, 1982, appellant reported that he was developing a plan for getting back on schedule. However, by the end of March, the Housing Authority was one hundred forty-three units behind schedule and in June of 1982, one hundred eighteen units behind schedule.
The record reveals that during the period when the preventive maintenance repairs were falling behind schedule Cates personally reassigned 15 personnel from the Desire work crew to work on programs at other developments and problems were encountered with the improper order of, or nonarrival of, needed materials. Of interest is the following colloquy between appellant’s attorney and Cates:
Q. Okay, did the time that it nosedive coincide at all when, under your orders, one of the work crews was taken away from Desire for eight months to work on the roofs at Imperial Drive?
A. I don’t think so.
Q. If it did, do you think that would explain part of what happened here?
A. If it did, we should have made some other arrangements to augment the crew so as to prevent the nosedive.
Q. Did Mr. Nicholas have enough personnel at his disposal to be able to make those changes?
A. Got five hundred of them out there. He can change them any way he wants to.
Q. If he pulled the crew off of St. Thomas to work on Desire, is that within the scope of his authority?
A. Sure.
Q. What would happen at St. Thomas if he did that?
A. Well, I certainly wouldn’t want him to pull a crew away from doing a job that were doing that had to be done immediately just that — there are always some work force, work people, that you can move to another location to take care of a situation, but you’ve got to look at the total picture to see how it impacts your operation.
Q. How about
*1196 A. They did nothing in this instance. They let it nosedive.
Q. How about finance? Was there enough money around to be able to do all this work within the budget constraints that you had?
A. I think so.
Q. Okay. How about — what’s the present situation on the Desire consent decree?
A. We still haven’t made up the number of apartments that we’re behind. We’re trying to do it now. We have an agreement with Mr. Fox, who’s with NOLAC, that as long as we do forty apartments a month, it’s satisfactory for the present time.
Q. So, in the time since then, the amount of apartments that got behind have not been caught up?
A. We’ve made up some, but not all of them.

Q. Do you think if you were in charge of this program, Mr. Cates, that you could’ve brought it all up to snuff and kept it right there without doing any disservice to any of the other developments that you had been in charge of?
A. Maybe.
It is significant to note that as of June, 1982, appellant had managed to decrease the number of units which were behind schedule from 143 to 118. As of the time of the hearing (approximately one year after Nicholas’ termination) HANO was still behind schedule. We find that appellant’s actions in the above discussed instances do not constitute legal cause for disciplinary action. The commission’s conclusions in this regard are clearly wrong.
H) READY COOPERATION
The commission found that:
“36. Appellant did not readily cooperate with the Housing Authority’s attorney and staff personnel of the Housing Authority in obtaining information and records on July 2, 1982.”
The record reveals that appellant was instructed by Cates to retrieve records and information on July 2, 1982. Mr. Chad-bourne, Acting Deputy Executive Officer for Management, testified:
What I remember about that was that you all wanted to see copies of the bylaws and — I don’t know if they’re called constitutions or not — but, nevertheless, the authorizing documents of the resident councils. And this was on that Friday evening. And you asked Mr. Nicholas, one of you or both of you asked Mr. Nicholas for the documents, and he said that he did not know where they were. And it happened that I did know. They were in a filing cabinet up in the Management Department. And I said that I thought that I knew where they were. And so, I believe you all said to go get them. In fact, I think you told Mr. Nicholas to go get them. In fact, I’m sure you did, because at that time, I had no plan of going myself. And at that time, he said that they would be locked up, and he didn’t know where the key was. And I said that I thought I knew where the key was.
I think at that point Mr. Cates ran us both out of his office to go get them right away, because it was obvious that you all wanted them.
And so, we went up to Management; we found the keys where, in fact, I thought they would be. And, luckily, I was right about the drawer in the filing cabinet, and we were able to bring back a sample of these authorizing documents for the councils.
That’s the only — we reviewed those af-terwards and discussed them. And that’s the only activity that I can remember having had in discussion that evening.
Q. Okay. Now, more particularly, with respect to Mr. Nicholas, what was his attitude or behavior, or how did he behave when asked to go get these documents?
A. He seemed to feel that he didn’t know where they were and didn’t want to go. He was sure he wouldn’t be able to *1197 find them and didn’t want to go look for them. That was the impression that I got.
Q. You don’t recall any other behavior on his part?
A. He seemed a little bit exasperated or annoyed when he was pressed to go get them because you all felt it was important to have them.
Q. Did he have anything in his hand at the time?
A. I have no idea.
Q. Did he come back with you in the executive office with the samples?
A. Yes.
I’m saying yeah ... I don’t know if he walked back with me, but I’m almost positive that he ended up back. As far as whether he came with me at that moment, I’m really not sure.
Q. Who brought the sample documents to us?
A. I carried them in.
It is uncontradicted that after being ordered to do so both Nicholas and Chad-bourne retrieved the requested records from the filing cabinet.
We find that the appointing authority has failed to prove that Nicholas’ actions in the above described instance constitutes legal cause for disciplinary action. We find the commission’s holding to the contrary to be clearly wrong.
I)BUDGET BOOKS AND COST OVER-RUNS
The commission found that:
31. At the end of the 1981-82 fiscal year, Mr. Cates instructed appellant to have a meeting with the Development Managers to convey the necessity for maintaining their budget books. By the end of January 1982, it was discovered that budget books were not being maintained at the Desire Development and the St. Bernard Development. There was also a serious over-run in materials at the two cites.
The record reveals that the audit of the Desire and St. Bernard developments completed as of January 25, 1982, were for the first financial quarter of the 1982 fiscal year. We note that during this period preventive maintenance was being performed at the Desire development in compliance with the consent decree. Mr. Mora, the auditor, testified that the budget overrun at the St. Bernard development was due to the operating budget subsidizing the St. Bernard Modernization Program which was discussed supra. Although the budget overruns and budget books were not currently maintained and this was brought to Cates’ attention on January 25, 1982, Cates apparently did not think that Nicholas deserved disciplinary action at that time. No evidence was presented in reference to verbal or written reprimands. Cates obviously felt that Nicholas was deserving of a satisfactory civil service rating as of May 10, 1982. However, six months later, he seeks to resurrect these “transgressions by appellant” as a basis for a disciplinary action. Our brethren of the Fourth Circuit have held that the appointing authority, was estopped from prosecuting a disciplinary action based on activities which occurred at least five months prior. Robbins v. New Orleans Public Library, 208 So.2d 25 (La.App. 4th Cir.1968). Accordingly, we hold that the above described activities may not be used as a basis (legal cause) for disciplinary action. The commission’s finding in this instance is clearly wrong.
J)COMMENT TO SECRETARY
The commission found that:
“39. Appellant did tell a secretary who typed some statements relative to this disciplinary action that she was on his ‘shit list.’ ”
A review of the record adequately supports this finding. We find no manifest error herein.
K)DISRESPECTFUL WRITTEN COMMENT
The commission found that:
*1198 26. On May 7, 1982, Mr. Cates received a draft of a letter of suspension pending termination for an Equipment Operator assigned to the St. Bernard Development. Mr. Cates returned the draft to appellant to correct errors. Appellant returned the draft to Mr. Cates nearly the same as it was before. Mr. Cates again returned the draft to appellant to be corrected. Appellant returned the draft to Mr. Cates with the suggestion that he compose his own letter or have Mr. White or Mr. Barconey do it for him.
A letter dated May 28, 1982, written by Nicholas and submitted to Cates for his signature was admitted as evidence. A memorandum dated June 1, 1982, was submitted by Nicholas to Cates in reference to the letter. The memorandum reads as follows:
Transmitted herewith is a letter that I have written for the second time in an attempt to terminate the employment of Eric Brown. Each time I have been unable to secure your signature or the signatures of Mr. White or Mr. Barconey— persons authorized to sign for you.
Since it appears that I am unable to say what you, Mr. White or Mr. Barconey want to say, in the precise language you would like to have it said, I am respectfully requesting that you compose your own letter or have Mr. White or Mr. Barconey do it for you.
Cates stated that the letter was unacceptable and the language was a direct effrontery.
The first draft of the letter as well as the comments and criticisms of Cates in reference to the first draft were not introduced as evidence, therefore, it is impossible to determine whether Nicholas had made a good faith effort to comply with the proposed changes. It is apparent from the record that the relationship between the two men had deteriorated by this date. Disagreements between a civil service employee and his superior are not basis for disciplinary action “absent a showing that such personality defects produce results found to be prejudicial to the efficiency of the public service.” Brickman v. New Orleans Aviation Board, 107 So.2d 422, 431 (La.1958) (emphasis original). Technically, Nicholas did not refuse to rewrite the letter by “respectfully requesting” that Cates compose it himself. We find that the appointing authority did not meet its burden of proving that Nicholas’ actions in the above described incident amounted to legal cause for disciplinary action. We find the commission’s findings in this instance to be clearly wrong.
L) SECURITY GUARDS
The commission found:
20. Appellant reported to Mr. Cates on May 3, 1982, about theft of material and vandalism in the St. Bernard Modernization Program. However, security was a responsibility of the Management Division and appellant had taken no steps to solve the security problems. Mr. Cates received no follow up report from appellant and had to request a status report from appellant.
7. By memorandum dated June 21, 1982, Mr. Cates asked appellant to furnish him with information pertinent to difficulties with a contractor and the guard service at the Fischer Project. Appellant did not respond and on June 23, 1982, Mr. Cates again requested that the information be furnished by June 24, 1982. Appellant did not respond.
Mr. Triggs, then Area Director for the St. Bernard development, and Mr. Dupre, then Area Director for the Fischer development, testified that they and Nicholas had numerous telephone conversations with the security guard firm in an attempt to obtain better service. They discussed the possibility of termination of the contract should better service not be provided. Nicholas testified that he had met with employees of the security firm and the firm had agreed to reimburse HANO for certain stolen materials. After determining that the guard service had not substantially improved, Nicholas requested another meeting with the guard firm and reported the problems and scheduled meeting to Cates by memo *1199 randum dated June 18, 1982. The security guard issue was addressed by Nicholas, under cross-examination in the following colloquy:
Q. On the Standard Roofing Company and the Wells-Fargo security guards, did you provide in writing to Mr. Cates the information he asked for?
A. Finally, we resolved it, or I provided the information in a conference with Mr. Cates.

Q. Now, did I understand you correctly when you testified earlier that in discussions that you had had with a couple of officials from Wells-Fargo that they agreed to pay for some stolen items?
A. You heard me correctly, sir.
Q. Okay. And how much money were they supposed to pay?
A. They were going to pay the actual costs.

Q. Mr. Nicholas, in connection with this Wells-Fargo situation: If this is a problem that you had worked on to work out with Wells-Fargo, why was it necessary to get Mr. Cates involved?
A. Because we’re still having problems with Wells-Fargo. They were still reporting to work at the site — I told you on the onset there were two areas involved: The Fischer Homes and the St. Bernard Development. We are still having them promising to report to duty and not in fact reporting. We’re still getting complaints. Like — it was an ongoing thing. They were making promises, but they were never keeping them. They were setting up meetings with us to come down to talk with them and — and—they didn’t come down on some occasions. And I find myself just spinning my wheels, and I — the Management Division is just too large for me to just spin my wheels trying to satisfy one agency. They didn’t show up. I came up — it’s in the testimony in a written letter to Mr. Cates that they did not keep their promise, and that is why I called them down to talk with Mr. Cates. Because we were continuing to have problems, and I felt that at this point in time keep bringing it to Mr. Cates’ — and then probably he would cancel the contract inasmuch as I did not have the authority to.
Q. On, but — is that what — is that what you intended, for the contract to be can-celled? Is that what you wanted to happen?
A. Or get with the higher ups and make them perform their duty, one or the other. Either way would have satisfied me.
We find that the appointing authority has failed to prove that the above incidents are legal cause for disciplinary action. The findings of the commission in this instance are clearly wrong.
M) UNFRUITFUL RESPONSE TO MEMORANDUM OF MAY 3, 1982
The commission found that:
8. On May 3,1982, Mr. Cates requested that appellant furnish him with certain information relative to the Desire Project, the St. Bernard Project; and the Section 8 Management situation. By May 11, 1982, appellant had not responded and Mr. Cates issued a follow up memorandum requesting that appellant respond immediately. Appellant responded on May 14, 1982 but Mr. Cates did not consider the report sufficient and communicated his dissatisfaction with the report to appellant. Mr. Cates did not receive a revised report from appellant. Appellant did not report a fire damage that occurred in the Desire Community Building on April 14, 1982 by memorandum dated April 14, 1982.
A review of Nicholas’ memorandum to Cates dated May 14, 1982, (exhibits H 19-24) appears to be a good faith effort on the part of Nicholas to adequately respond to Cates’ May 3, 1982, inquiry. Cates’ response of May 18, 1982, is an indication of the personality conflict between Nicholas and Cates, i.e., “it is the poorest excuse of a status report that I have ever seen.”
The memorandum concluded with an order by Cates “I certainly do want to review *1200 these situations with you right away, but before you call for a meeting, please review these situations and come prepared to discuss them completely.” The letter of termination, in addressing these allegations reads in part: “To date I have not received a revised report, but have met with you on both the Section Eight and St. Bernard Modernization Programs.” However, a three page memorandum dated May 25, 1982, to Cates from Nicholas specifically addressed the issue of the status of the Desire Community Center. The record contains no evidence in reference to Nicholas meeting with Cates to discuss the steel doors at the Desire development, although it is uncontradicted that the necessary steel doors were replaced. The follow-up meeting or follow-up report requested by Cates in the May 18, 1982, memorandum was not complied with by Nicholas only in reference to the steel doors at the Desire development. The record does not reflect that Nicholas intended to disobey an order by his failure to accomplish this task. Failure to accomplish this task may be construed as legal cause for disciplinary action, however, it was not an act of insubordination.
The commission’s factual findings that Nicholas completely failed to comply with the May 11, 1982, memorandum is clearly wrong. It was also clearly wrong in finding the May 14, 1982, memorandum of Nicholas to Cates to be an act of incompetence. It was also clearly wrong in determining that Nicholas’ failure to make a follow-up report to Cates in reference to the steel doors was an act of insubordination. Nicholas’ failure to report fire damage occurring on April 14, 1982, was not alleged as a basis for disciplinary action in the letter of termination.
N) POLICY STATEMENT
The commission found that:
9. By memorandum dated June 16, 1982, Mr. Cates instructed appellant to prepare a policy statement for immediate use by his division relative to the propriety of relocating residents of housing projects to other apartments when they were found to be guilty of causing fires. The memorandum included a copy of an opinion by an attorney for the Housing Authority for appellant’s use in preparing the policy statement. Appellant did not prepare the policy statement, but rather contacted the Housing and Urban Development (hereinafter HUD) requesting clarification of HUD regulations relative to this situation.
By memorandum dated June 16, 1982, Cates instructed Nicholas to prepare a policy statement for immediate use by members of Nicholas’ department. The statement was to take into account the legal opinion of HANO attorney, Olsen, as well as to incorporate elements of the dwelling lease as well as “all the pertinent issues, including investigatory procedures and appeals.” No deadline was given by which the policy statement was to be prepared.
In an attempt to comply with the June 16, 1982, memorandum, by letter dated June 17, 1982, Nicholas requested clarification of HUD regulations on this matter. Cates alleged this to be an example of Nicholas’ incompetence and refusal to accomplish tasks by a given deadline.
The letter by Nicholas to HUD Deputy Director for Management reads as follows:
Dear Mr. Duncan:
Please review the attached June 16 memorandum to me from Mr. Cates which summarizes the opinions given by Mr. Olsen in his letter of June 8 (attached) to Mr. Cates.
In order to implement Mr. Cates’ directive to prepare a definitive policy, information is needed from HUD.
You will note that Mr. Cates wrote that the HANO lease “apparently” provides for eviction under given circumstances or charging of repair costs under other circumstances. Is this so?
The precedents cited by Mr. Olsen do not take into account HUD regulations. For this reason, I would like clarification about HANO’s ability under those regulations to evict and assess charges.
*1201 Your additional comments and guidance in preparing the policy will be appreciated.
Nicholas’ authority to run his department was described by Cates in the following colloquy:
Q. What — tell me what kind of authority Mr. Nicholas had as the head of the Management Division? I mean, in your view what kind of decisions could he make on his own, and what kind of decisions could — you know, that he had to make with you? What kind of decisions have to be made by the board? What kind of decisions have to be made by HUD? Give me an idea of the outlines of the authority that we’re talking about.
A. Mr. Nicholas had complete authority to run his division. Because of the subsidy that HUD pays to us in order for us to operate — remember, the only monies we get to operate with come from rent collections and rent subsidies from HUD in the amount of annual contributions payments, annual contributions contracts. Because they furnish us with that money, there are certain things that we must live up to in order to qualify for that money. Those are far too many to enumerate completely for you, but we have to work by HUD guidelines in order to qualify for the money and to remain open as a public housing authority.
Q. So, within the — within the constraint of HUD guidelines, Mr. Nicholas has complete authority to run his division?
A. It’s not that simple.
Q. Oh, I’m sorry, I thought that’s what you’d said. Okay, could—
A. Mr. Nicholas had the complete authority to run his division with the exceptions of certain restrictions that HUD placed on me, on him, on the Housing Authority in general.
A review of the record leads to the conclusion that Nicholas was attempting to comply with the directive issued the previous day. Taking into consideration Cates’ testimony Nicholas cannot be faulted for exercising his discretion as the head of management to ascertain whether the policy statement he was ordered to issue was in compliance with HUD. In addition, no time limit was given by Cates in the June 16, 1982, memorandum by which the policy statement was to be prepared. It is clear that Nicholas took action on Cates’ request within twenty-four hours. The commissions’ findings to the contrary are clearly wrong.
0) GOALS AND OBJECTIVES
The commission found that:
6. On May 25, 1982, and again on June 1, 1982, Mr. Cates requested appellant to provide him with a written outline of appellant’s goals and objectives. On June 10, 1982, appellant responded by providing Mr. Cates with a general outline of appellant’s job description. Mr. Cates informed appellant that the report was insufficient and advised that the report would have to be revised and resubmitted by June 18, 1982.
On June 18, 1982, appellant informed Mr. Cates that he would not be able to meet the deadline. Appellant was reminded of the necessity for submitting the report on June 23, 1982 but never did submit the report. •
Appellant testified that Cates wanted appellant to provide a management by objectives report. Appellant stated that this had been found to be an ineffective approach for use in management.
Nicholas testified:
But, as I stated I considered this form many a times; I labored over this, as I stated. But I couldn’t possibly see any way — for example, reduce the present number of vacancies by “x” number of units by “x” date of the month or year of nineteen hundred so-and-so. I couldn’t do that. It wasn’t possible to do that ... It was a decision not to fill out the form. It was an agonizing thing. How could I do this and still maintain the progression that Mr. Cates would have expected and maintain my job.
*1202 The record reveals that Nicholas was reluctant to respond because he feared that by setting numbered goals as instructed by Cates he would be setting himself up to be terminated should it be impossible to accomplish those goals.
The fact remains that Nicholas did not comply with Cates June 23, 1982, memorandum. The test to determine legal cause for disciplinary action is whether the “conduct complained of impairs the efficiency of the public service and bears a real and substantial relation to efficient and orderly operation of the public service in which the employee is engaged.” Thornton v. DHHR, 394 So.2d 1269, 1270-1271 (La.App. 1st Cir.1981). Appellant’s failure to submit the goals and objectives can be construed as an act of insubordination on his part, even though appellant feared that the end result of his submitting the report would lead to his termination. His fears were apparently well founded because Cates did indeed decide to terminate him. The findings of fact by the commission in this instance are not clearly wrong.
PENALTY
“Obviously, dismissal from permanent employment is the most extreme form of disciplinary action that can be taken against a classified state employee. Thus, cause justifying some lesser form of disciplinary action might not justify a dismissal.” Cartwright v. Department of Revenue and Taxation, 460 So.2d 1066, 1068 (La.App. 1st Cir.1984), writ denied, 463 So.2d 1320 (La.1985). Appellant has a 26 year history of employment as a classified civil servant in an administrative position at HANO. He has never received an unsatisfactory civil service rating. Not one co-employee (except for Cates) testified that Nicholas ever performed his duties in an unsatisfactory manner. The testimony was overwhelming that Nicholas always had the best interest of HANO at heart and was a very dedicated and tireless worker who always attempted to assist his workers in any way possible.
In light of the above and in compliance with the Louisiana Supreme Court mandate in Walters v. Department of Police of City of New Orleans, 454 So.2d 106, 114 (La.1984), that a disciplinary action based on legal cause should be commensurate with the infraction and should not be set aside unless “arbitrary, capricious or characterized by abuse of discretion”, we hold the penalty to be an abuse of discretion.
This case is ordered remanded to the Civil Service Commission for assessment of a proper penalty which is consistent with the views of this opinion.
REVERSED AND REMANDED.